UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 09-23697-CIV-LENARD
MAGISTRATE JUDGE P. A. WHITE

JULIO PINTADO,                    :

       Plaintiff,        :

v.                                :                REPORT OF
                                                  MAGISTRATE JUDGE
MS. DORA, et al.,                 :

       Defendants.       :

_____

## I   INTRODUCTION

In this case, plaintiff Pintado, when confined as a state prisoner at Wakulla C.I. Annex, filed a *pro se* civil rights complaint pursuant to 42 U.S.C. §1983 (DE#1), complaining that corrections and medical staff subjected him to deprivations at Everglades C.I. ("ECI") where he was previously confined. His claims stem from an incident at the ECI kitchen on August 13, 2008, during which he sustained injury to his left hand, which included severing and loss of portions of his 3rd and 4th fingers, after allegedly being told he must help clean and do maintenance on a dishwasher and stove.

The Complaint (DE#1, signed 11/30/09 and docketed 12/11/2009), named six defendants: 1) Ms. Dora, Director, Trinity Food Service Group; 2) Ms. Sonya, ECI Food Service Director; 3) Mr. Tamargo [sic, Camargo], ECI Maintenance Supervisor; 4) Mr. Diaz, ECI AC Maintenance Supervisor; 5) Dr. Carl Balmir, M.D., the ECI Chief Health Officer; and 6) Ms. Jerry [sic Jeanette Jarrett] RN at ECI.

On 12/30/09 plaintiff was granted leave to proceed in forma pauperis (Order, DE#5); and as to five of the six defendants, Service of Process was Ordered (DE#6). Executed Returns were filed for Dr. Balmir (DE#13), Nurse Jerry (DE#14), Mr. Diaz (DE#15) and Mr. Tamargo [Camargo] (DE#16). An unexecuted return was filed for Ms. Sonya (DE#12), and plaintiff was instructed to give a current address for her (Order DE#17). As to the 6th defendant, Ms. Dora, Plaintiff filed a motion for a Clerk's Default (DE#32) which was denied (Order, DE#34); service was ordered for her (DE#38), and for Ms. Dora an unexecuted return was subsequently filed (DE#40).

**This Cause is before the Court upon two motions for summary judgment, the first filed jointly by Diaz and Camargo (DE#35)** with Exhibits at DE#35-1**), and the second filed jointly by Balmir and "Ms. Jerry," a/k/a Jeanette Jarrett, R.N. (DE#36),** with Exhibits (at DE#s 36-1, 36-2). In an Order of Instructions (DE#37) Plaintiff Pintado was informed of his right to oppose both summary judgment motions.[1] Plaintiff moved for an extension of time (Motion, DE#41,

---

[1]    Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is proper

> [i]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.

In Celotex Corp. v. Catrett, 477 U.S. 317 (1986), the Court held that summary judgment should be entered only against

> a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.   In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to judgment as a matter of law' because the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.  (citations omitted)

Thus, in Celotex Corp. v. Catrett, 477 U.S. 317 (1986), the Court held that summary judgment should be entered only against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to judgment as a matter of law' because the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof. (citations omitted). Thus, pursuant to Celotex and its progeny, a movant for summary judgment bears the initial responsibility of informing the court of the basis for his motion by identifying those parts of the record that demonstrate the nonexistence of a genuine issue of material fact. This demonstration need not be accompanied by affidavits. Hoffman v. Allied Corp., 912 F.2d 1379, 1382 (11 Cir.1990).If the party seeking summary judgment meets the initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party, to come forward with sufficient evidence to rebut this showing with affidavits or other relevant and admissible evidence. Avirgan v. Hull, 932 F.2d 1572, 1577 (11 Cir.), cert. denied, 112 S.Ct. 913 (1992). It is the nonmoving party's burden to come forward with evidence on each essential element of his claim sufficient to sustain a jury verdict. Earley v. Champion International Corp., 907 F.2d 1077, 1080 11 Cir.1990). The non-moving party cannot rely solely on his complaint and other initial pleadings to contest a motion for summary judgment supported by evidentiary material, but must respond with affidavits, depositions, or otherwise to show that there are material issues of fact which require a trial Fed.R.Civ.P. 56(e); Coleman v. Smith, 828 F.2d 714, 717 (11 Cir.1987). If the evidence presented by the nonmoving party is merely colorable, or is not significantly proba-

mailed from Central Florida Reception Center ("CFRC") dated
9/1/10), and he was granted until 10/4/10 to Respond to the summary
judgment motions (Order, DE#42, entered 9/10/10 and mailed to him
on that date at CRFC). Pintado then filed a Notice of Change of
Address (DE#43, dated 9/23/10 and mailed from Zephyrhills C.I.
("ZCI") on 9/24/10) stating Pintado had been transferred from CFRC
to ZCI. Pintado then submitted a motion to Stay (Motion, DE#44,
dated 9/27/10, mailed from ZCI), which was denied (Order DE#45,
entered 9/30/10, mailed to ZCI), but he was granted an additional
extension of time until 10/28/10 in which to Respond to the
defendants' motions (Order, DE#45). Pintado thereafter filed a
motion for appointment of counsel (Motion, DE#47) which was denied
(Order, DE#48). The record reflects no substantive response filed
by him in opposition to the defendants' summary judgment motions.

## II   DISCUSSION

### A.   Plaintiff's Allegations

Plaintiff Pintado in his complaint alleges the following. On
8/13/08 he was assigned by Mr. Diaz to help repair a dishwasher at
ECI food service. Mr. Camargo approached Diaz, and asked permission
to use Pintado to clean and do maintenance on a gas stove. Pintado
voiced concerns to Diaz and Camargo that he was untrained and lack-
ed skills and knowledge to perform mechanical repairs. Camargo al-
legedly told Pintado, "[d]o the work or go to confinement." Fearing
a possible disciplinary report and confinement, Pintado did what
Camargo verbally ordered him to do. Pintado was not issued work
boots or gloves. With another inmate's help, Pintado was attempting
to move a stove that weighed over 675 pounds, when a portion of the
stove suddenly fell, severing his fingers. Pintado alleges his

---

tive, summary judgment may be granted. Anderson v. Liberty Lobby, Inc., 477 U.S.
242, 249-50 (1986); Baldwin County, Alabama v. Purcell Corp., 971 F.2d 1558 (11
Cir.1992). "A mere 'scintilla' of evidence supporting the opposing party's posi-
tion will not suffice; there must be enough of a showing that the jury could
reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11 Cir.
1990) (citing Anderson v. Liberty Lobby, Inc., supra).

Pursuant to Brown v. Shinbaum, 828 F.2d 707 (11 Cir. 1987), the Order of
Instructions (DE#37) was entered, to inform the plaintiff Pintado, as a pro se
litigant, of his right to oppose the defendants' motions (DE#s 35 and 36) for
summary judgment pursuant to Fed.R.Civ.P. 56, and instructing Pintado regarding
requirements under Rule 56 for a proper response to such motions.

footing slipped on the wet floor. He also alleges that "as a result of the accident he was bleeding profusely; suffering substantial swelling in his left hand and remaining fingers and lost of movement and feeling in his left hand and remaining fingers."

Pintado alleges that Nurse Jerry [Jeanette Jarrett], instead of putting his severed fingers on ice, put them in a glass of milk before he was transported to the prison medical unit by correctional staff. Nurse Jarrett determined that Pintado should be sent to the hospital, and he was taken to the ER at Baptist Hospital in Kendall. There, doctors determined that the severed portions of his fingers could not be surgically reattached because they had been placed in milk rather than on ice. Pintado was released from the hospital and upon his return to ECI complained to Dr. Balmir and Nurse Jarrett that "his left hand was in constant pain, that his hand lacked mobility in both the fingers and hand, the hand was constantly cold to the touch and that he had suffered obvious nerve damage." Pintado alleges that he repeatedly sought medical treatment from Jarrett and Balmir, who, "refused to perform a Cat Scan, MRI and necessary evaluations and test to properly evaluate and diagnose the extent of damage to plaintiff's hand following the incident." He further alleges that Jarrett and Pintado "refused to prescribe pain medications or refer [him] to a specialist to confirm and evaluate, diagnose and treat [his] continued medical condition, which resulted in both pain and mental suffering."

Pintado alleges that Ms. Dora failed to provide adequate upkeep of the food service area and the equipment therein. He alleges that Ms. Sonia "was negligent when injury was reasonably forseeable when not adequately ensuring the condition of the floor which was wet, water soaked and slippery at the time of the incident," and failed to act "to prevent forseeable injury."

Pintado states he was transferred to Wakulla CI Annex after he filed a 12/29/08 grievance [Log 0901-401-009]. Without more, he alleges the transfer "was in retaliation by prison administration."

Pintado alleges that after being transferred to Wakulla CI he

4

complained to medical staff of the aforementioned symptoms, including continued pain, and lack of mobility in his hand and fingers. They transferred him to the Medical and Reception Center ("RMC") at Lake Butler where according to Pintado "examination confirmed the damage to plaintiff's hand, loss of fingers 3rd and 4th on his left hand, loss of strength and mobility, dexterity and resulting nerve damage caused by the incident."

### B.   Unserved Defendants, Ms. Dora, and Ms. Sonya

The unexecuted returns filed for Ms. Sonya and for Ms. Dora (DE#s 12 and 40), bear the Deputy Marshals' notations that ECI officials could not identify them as working there. Under the circumstances that plaintiff Pintado was advised of his duty to provide full names, titles, and service addresses for all defendants, or risk the dismissal of those defendants for whom the required information is not provided (Order of Instructions, DE#4), and where he has been unable to obtain and provide the required information for "Sonya" and "Dora," it appears that, as to them, the complaint should be dismissed pursuant to Fed.R.Civ.P. 4(m), which provides for dismissal of a pleading which could not be served within 120 days of its filing.

### C. The Retaliatory Transfer Claim

As for Pintado's allegation of a retaliatory transfer, the present discussion constitutes an initial review of the claim, for which the standard of review is distinct from that applied to the other claims [see footnote 1, supra] on which on which the defendants have moved for summary judgment.[2]

---

[2]   As amended, 28 U.S.C. §1915 reads in pertinent part as follows:

Sec. 1915 Proceedings in Forma Pauperis

*   *   *

(e)(2) Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that –

*   *   *

(B) the action or appeal –

Although claims of retaliatory transfer are cognizable under 42 U.S.C. §1983, here Pintado has named no defendant in conjunction with this assertion in this case. In the absence of a causal

---

\*   \*   \*

(I)  is frivolous or malicious;

(ii) fails to state a claim on which relief may be granted; or

(iii) seeks monetary relief from a defendant who is immune from such relief.

This is a civil rights action Pursuant to 42 U.S.C. §1983. Such actions require the deprivation of a federally protected right by a person acting under color of state law. See 42 U.S.C. 1983; Polk County v Dodson, 454 U.S.312 (1981); Whitehorn v Harrelson, 758 F. 2d 1416, 1419 (11 Cir. 1985. The standard for determining whether a complaint states a claim upon which relief may be granted is the same whether under 28 U.S.C. §1915(e)(2)(B) or Fed.R.Civ.P. 12(b)(6) or (c).  See Mitchell v. Farcass, 112 F.3d 1483, 1490 (11 Cir. 1997)("The language of section 1915(e)(2)(B)(ii) tracks the language of Federal Rule of Civil Procedure 12(b)(6)"). A complaint is "frivolous under section 1915(e) "where it lacks an arguable basis either in law or in fact." Neitzke v. Williams, 490 U.S. 319, 325 (1989); Bilal v. Driver, 251 F.3d 1346, 1349 (11 Cir.), cert. denied, 534 U.S. 1044 (2001). Dismissals on this ground should only be ordered when the legal theories are "indisputably meritless," id., 490 U.S. at 327, or when the claims rely on factual allegations that are "clearly baseless." Denton v. Hernandez, 504 U.S. 25, 31 (1992). Dismissals for failure to state a claim are governed by the same standard as Federal Rule of Civil Procedure 12(b)(6). Mitchell v. Farcass, 112 F.3d 1483, 1490 (11 Cir. 1997)("The language of section 1915(e)(2)(B)(ii) tracks the language of Federal Rule of Civil Procedure 12(b)(6)").  In order to state a claim, a plaintiff must show that conduct under color of state law, complained of in the civil rights suit, violated the plaintiff's rights, privileges, or immunities under the Constitution or laws of the United States.  Arrington v. Cobb County, 139 F.3d 865, 872 (11 Cir. 1998).

To determine whether a complaint fails to state a claim upon which relief can be granted, the Court must engage in a two-step inquiry.  First, the Court must identify the allegations in the complaint that are not entitled to the assumption of truth. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)). Twombly applies to §1983 prisoner actions.  See Douglas v. Yates, 535 F.3d 1316, 1321 (11 Cir. 2008).  These include "legal conclusions" and "[t]hreadbare recitals of the elements of a cause of action [that are] supported by mere conclusory statements."  Second, the Court must determine whether the complaint states a plausible claim for relief.  Id.  This is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  The plaintiff is required to plead facts that show more than the "mere possibility of misconduct."   The Court must review the factual allegations in the complaint "to determine if they plausibly suggest an entitlement to relief." When faced with alternative explanations for the alleged misconduct, the Court may exercise its judgment in determining whether plaintiff's proffered conclusion is the most plausible or whether it is more likely that no misconduct occurred. [The application of the Twombly standard was clarified in Ashcroft v. Iqbal, 129 S.Ct. 1937 (2009)].

connection between named defendants in this case and the deprivation alleged, they cannot be held liable under 42 U.S.C. §1983. See Harris v. Ostrout, 65 F.3d 912, 917 (11 Cir. 1995). There is no allegation, nor suggestion or evidence of record, to indicate that any of the named defendants, including the maintenance officers and medical staff members who have been served with process in this case, had any power or authority over inmate population control, and/or transfer of inmates from one institution to another. As to the named defendants, on this claim, the complaint fails to state a claim, and should be dismissed pursuant to 28 U.S.C. §1915(e)(2)(B)(ii).

### D.   The Four Defendants Who Were Served With Process And Their Summary Judgment Motions

#### 1.   Diaz and Camargo (Summary Judgment Motion DE#35) (Claim of Endangerment)

The gravamen of Pintado's complaint against Diaz and Camargo is a claim of endangerment or failure to protect from risk of harm.

It is a fundamental principle that for §1983 liability to be imposed, a plaintiff must establish proof of an affirmative causal connection between a particular person acting under color of state law and the constitutional deprivation alleged. Harris v. Ostrout, supra, 65 F.3d at 917; Swint v. City of Wadley, Ala., 51 F.3d 988, 999 (11 Cir. 1995); LaMarca v. Turner, 995 F.2d 1526, 1538 (11 Cir. 1993); Williams v. Bennett, 689 F.2d 1370, (11 Cir. 1982)(citing Monell v. Dept. of Social Servs., 436 U.S. 658, 692 (1978)).

For prison officials to be constitutionally liable for failure to protect the safety of an inmate, two requirements must be met. First, the deprivation alleged must be, objectively, "sufficiently serious." Wilson v. Seiter, 501 U.S. 294, 298 (1991); Hudson v. McMillian, 503 U.S. 1 (1992). Thus, for a claim based on an alleged failure to prevent harm, an inmate must first show that he is incarcerated under conditions that pose a substantial risk of

serious harm. <u>Farmer v. Brennan</u>, 511 U.S. 825, 834 (1994). Second, the prison official who ignores a substantial risk of serious harm to an inmate must have a "sufficiently culpable state of mind," <u>Farmer</u>, <u>supra</u>, 511 U.S. at 834.   In cases predicated on prison conditions, that state of mind is one of "deliberate indifference" to the inmate's health or safety.  <u>Wilson</u>, <u>supra</u>, 501 U.S. at 302-03; <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976).

Traditionally, applicable authorities have described "deliberate indifference" as a state of mind more blameworthy than mere negligence or even gross negligence, <u>Estelle</u>, <u>supra</u>, 429 U.S. at 104; <u>Parker v. Williams</u>, 862 F.2d 1471 (11 Cir. 1989), and as something more than a lack of ordinary due care for a prisoner's safety.  <u>Whitley v. Albers</u>, 475 U.S. 312 (1986).

Thus, in order to state a claim of cruel and unusual punishment under §1983, courts have required that a prisoner must allege a conscious or callous indifference to his rights by prison officials; <u>Brown v. Hughes</u>, 894 F.2d 1533, 1537-38 (11 Cir. 1990); <u>Washington v. Dugger</u>, 860 F.2d 1018, 1021 (11 Cir. 1988); <u>Williams v. Bennett</u>, 689 F.2d 1370 (11 Cir. 1982). Only such a degree of disregard for the prisoner's rights, which offends evolving contemporary standards of decency and is repugnant to the conscience of mankind, separates official conduct that is actionable under 42 U.S.C. §1983 from simple negligence which is not. When a plaintiff fails to allege and show proof of such an abuse, what may be an ordinary tort does not rise to the level of a constitutional violation actionable under §1983. <u>Rhodes v. Chapman</u>, 452 U.S. 337, 347 (1981); <u>Estelle</u>, <u>supra</u>, 429 U.S. at 106; <u>Byrd v. Clark</u>, 783 F.2d 1002, 1006 (11 Cir. 1986); <u>Hamm v. DeKalb County</u>, 774 F.2d 1567, 1572 (11 Cir. 1985); <u>Williams v. Bennett</u>, <u>supra</u> 689 F.2d at 1380.

The Supreme Court in <u>Farmer</u> emphasized that Eighth Amendment liability requires a showing that the responsible official was subjectively conscious of risk to the inmate:

> We hold...that a prison official cannot be liable
> under the Eighth Amendment for denying an inmate

humane conditions of confinement unless the official knows of and disregards an excessive risk to an inmate's health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference.

Farmer v. Brennan, supra, 511 U.S. at 837; Chandler v. Crosby, 379 F.3d 1278, 1289-90 (11 Cir. 2004)(quoting Farmer, at 837); Campbell v. Sikes, 169 F.3d 1353, 1362 (11 Cir. 1999) (liability may be imposed for deliberate indifference only if the plaintiff proves the defendant actually knew of "an excessive risk to inmate health or safety" and disregarded that risk; proof that defendant should have perceived the risk but did not, is insufficient").

## **Defendant Diaz**

Defenses which Diaz raises include that, based on the record, the plaintiff fails to show he caused a violation of plaintiff's constitutional rights; and he is entitled to qualified immunity.

Officer Diaz, in his Affidavit (DE#35-1, Ex.B), states that on 8/13/08 he was asked to repair a dishwasher and reported to the kitchen. There saw inmate Pintado. According to Diaz, Pintado on prior occasions, when assigned to Air Conditioning Maintenance, had worked for him. On 8/13/08, however, Pintado was not assigned to work with Diaz. Diaz states that when Pintado saw him, he said he was "on vacation." Diaz began working on the dishwasher, and did not see the accident involving the stove, because the dishwasher was around the corner and out of view from where it occurred. Diaz further states that he never told Pintado to do any task at the kitchen on 8/13/08, and only learned of the accident sometime after it occurred and Pintado had gone to the medical department.

Although, in his complaint, Pintado alleged that Officer Diaz was approached by Camargo, and that Camargo asked Diaz's permission to use him [Pintado] to clean and do maintenance on the stove, and that he [Pintado] told both Diaz and Camargo that he was not trained to perform repairs on the stove, Pintado at deposition stated that he was not asked to repair the dishwasher (DE#35-1,

Ex.A, T/39), and admitted under oath that Diaz did not tell him to go with Camargo, and that Diaz did not know that he had gone with Camargo (T/26). When Pintado was asked at deposition "[w]hat exactly is your claim against Mr. Diaz?," he responded under oath: "I actually don't have anything against Mr. Diaz." (T/40).

Under the circumstances, it is apparent that Pintado conceded under oath that he actually has no claim against defendant Diaz; and it is clear from the record, when Pintado's admissions under oath are read in conjunction with Diaz's Affidavit, that there is no showing of a causal connection between Diaz and the occurrence of Pintado's injuries, which is a required element if he were to be held liable on the endangerment claim under §1983. See Harris, Swint, LaMarca, and Williams, supra.

Under appropriate circumstances, qualified immunity insulates governmental officials from the burdens of civil trials and from personal liability for actions taken pursuant to their discretionary authority. Saucier v. Katz, 533 U.S. 194 (2001); Harlow v. Fitzgerald, 457 U.S. 800 (1982); Flores v. Satz, 137 F.3d 1275 (11 Cir. 1998); Foy v. Holston, 94 F.3d 1528 (11 Cir. 1996). Once the qualified immunity defense is raised by a defendant, the plaintiff bears the burden of showing that the federal rights allegedly violated were clearly established. Foy, supra, at 1532.[3] When faced with a question of qualified immunity, Courts pursuant to Saucier, supra, 533 U.S. at 199-200, overruled in part by Pearson v. Callahan, 555 U.S. 223, 129 S.Ct. 808 (2009), until recently engaged in a two-step analysis: first asking [taking the facts in the light most favorable to the plaintiff/non-movant] whether the offi-

---

[3]   The test for courts to use in determining whether an official is protected by qualified immunity is whether the official's conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." Smith v. Mattox, 127 F.3d 1416, 1419 (11 Cir. 1997) (quoting Harlow v. Fitzgerald, supra, 457 U.S. at 818)). The Court of Appeals for the Eleventh Circuit has held that in this Circuit the law can be "clearly established" for qualified immunity purposes, "only by decisions of the U.S. Supreme Court, Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose." Jenkins v. Talladega City Bd. of Education, 115 F.3d 821, 826-27 n. 4 (11 Cir. 1997)(en banc); Willingham v. Loughnan, 321 F.3d 1299, 1304 (11th Cir.2003).

cial's alleged conduct violated plaintiff's constitutional rights, and then proceeding, if necessary, to a second question, whether the right was clearly established at the time of the conduct. (Note: After the 2009 Supreme Court opinion in Pearson, supra, the Saucier two-step analysis is no longer an inflexible progression. Post-Pearson, courts are now free to answer the second step first). If a court, addressing the questions in the order set out in Saucier, first determines there was no constitutional violation, the inquiry ends there.[4] If, however, the alleged conduct amounts to a constitutional violation, the Court then must ask whether the right was clearly established at the time of the conduct.

Here, where it is apparent that defendant Diaz was not deliberately indifferent to plaintiff Pintado's constitutional rights, and there was no constitutional violation by him, it is clear Diaz is entitled to qualified immunity. The motion for summary judgment (DE#35) should therefore be granted on all claims against Diaz.

### **Defendant Camargo**

In the summary judgment motion (DE#35) defendant Camargo relies on several defenses. In part, he argues that plaintiff Pintado failed to exhaust his administrative remedies before bringing suit in federal court under §1983. Camargo also argues that Plaintiff Pintado fails to demonstrate that his actions rose to the level of a violation of his constitutional rights; and Camargo argues he is entitled to qualified immunity.

It appears Camargo is not entitled to relief, based on the defense that Pintado's claim against him is administratively unexhausted.[5] The record contains a formal grievance by Pintado

---

[4]      Cf Scott v. Harris, ___ U.S. ___, 127 S.Ct. 1769, 1774, 167 L.Ed.2d 686 (2007); and Cuvillier v. Rockdale County, 390 F.3d 1336, 1338 n. 4 (11 Cir. 2004) (explaining that the availability of the qualified immunity defense is "immaterial" when no underlying constitutional violation exists).

[5]      Asserting his lack of exhaustion defense, Camargo invokes 42 U.S.C. §1997e(a), which embodies a pre-suit administrative exhaustion requirement imposed upon prisoners with the enactment of the Prison Litigation Reform Act of 1995 ("PLRA").  The PLRA, as enacted on April 26, 1996, significantly altered a

filed at the Institutional Level at ECI, dated 12/29/08, which was

prisoner's right to bring civil actions *in forma pauperis*. Upon its enactment, the PLRA placed new restrictions on a prisoner's ability to seek federal redress concerning prison conditions (conditions of confinement). Subsection (a) of 42 U.S.C. §1997e, which is part of the PLRA, reads, as follows:

> (a) Applicability of administrative remedies
>
> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

The Courts have held that satisfaction of the PLRA exhaustion requirement serves as a threshold issue, since the statutory mandate requires a prisoner to have fully exhausted the administrative remedies/processes which are available to him or her, <u>before</u> bringing suit on a claim in federal court, regardless of the form of relief that the administrative process makes available. <u>See</u> <u>Booth v. Churner</u>, 532 U.S. 731, 736-41 (2001); <u>Alexander v. Hawk</u>, 159 F.3d 1321, 1325-26 (11 Cir. 1998); <u>Miller v. Tanner</u>, 196 F.3d 1190, 1193 (11 Cir. 1999); <u>Harris v. Garner</u>, 190 F.3d 1279, 1286 (11 Cir. 1999); <u>Harper v. Jenkin</u>, 179 F.3d 1311, 1312 (11 Cir. 1999).

The inmate grievance procedure for Florida Inmates, as published in the Florida Administrative Code ("F.A.C.") at §33-103, "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrongs." <u>Johnson v. Meadows</u>, 418 F.3d 1152, 1155 (11 Cir. 2005). In general, the rules for Florida inmate grievances, as published in the Florida Administrative Code, provide first for an inmate to file an Informal Grievance, <u>see</u> <u>F.A.C.</u> §33-103.005(1), and thereafter, if dissatisfied with the response, to file a formal grievance at the institution, <u>see</u>: <u>F.A.C.</u> §33-103.006, et seq. Thereafter, in the event that the inmate feels the grievance was not satisfactorily resolved during the formal grievance procedure, he may file a Request for Administrative Remedy or Appeal to the Office of the Secretary [Bureau of Inmate Grievance Appeals]. <u>See</u> <u>F.A.C.</u> §33-103.007, et seq.; <u>Chandler v. Crosby</u>, 379 F.3d 1278, 1288 (11 Cir. 2004).

Under certain circumstances, the inmate may bypass the filing of an informal grievance, and proceed directly to the filing of a formal grievance. (This includes instances of emergency, reprisal, or medical concerns). For example, as provided under <u>F.A.C.</u> §33-103.005, when the inmate is filing an emergency grievance, or a grievance of reprisal, the informal grievance may be skipped, and the inmate may proceed directly with the filing of a formal grievance, which is thereafter to be followed by an Appeal to the DOC Central Office in Tallahassee. Similarly, in the instance of medical concerns, the Code section relating to the handling of formal grievances (§33-103.006) provides that the inmate may bypass use of an initial informal grievance, and begin his medical complaint with a formal grievance at the institution (<u>see</u> §33-103.006(3)(e). This is known as a formal "Grievance of a Medical Nature" (<u>see</u> §33-103.008). If the inmate is dissatisfied with the result of a medical formal grievance (e.g., if it is denied), the Code provides that (like a non-medical formal grievance), the inmate is authorized to appeal to the Office of the Secretary. (<u>see</u> §33-103.007, <u>supra</u>, "Appeals to the Secretary").

Thereafter, if the formal grievance at the institutional level is properly filed, and denied, the inmate must file an Appeal at the DOC Central Office in Tallahassee.

denied on 1/16/09 (DE#35-1, p. 102-103), and an appeal therefrom, dated 1/22/09, which was denied on 3/10/09 (DE#35-1, pp.104-105). Although Camargo argues that Pintado's grievance focused on his medical concerns, review of the document shows that it also asserted that a maintenance supervisor required him to perform maintenance or repair he was not trained or certified to do. (DE#35-1, p.102). On appeal from the 1/16/09 denial, Pintado again asserted in part that he was injured when he was ordered to do maintenance he was not trained or certified to do, and that he did what he was told because he did not want to be put in lock down for refusing an order given by his boss. (DE#35-1, p.104). These filings are deemed sufficient to have exhausted Pintado's administrative remedies, despite the fact that the responses by DOC officials focused on his medical concerns.

The review must therefore turn to the questions whether Camargo's actions rose to the level of a constitutional deprivation, and whether he may be entitled to qualified immunity.

Camargo states in his affidavit (DE#35-1, Ex.C) that he is employed at ECI's maintenance department, that on 8/13/08 he was asked to remove the grill top of the stove so that it could be cleaned, and that he reported to the kitchen, and asked inmates who were present there to help remove the grill top. Camargo states that four inmates, one of whom was Pintado, stepped forward to grab the grill top, and states that he did not order Pintado to do so or be subject to a disciplinary report. Camargo states that the 4 inmates (Pintado and 3 others) lifted the grill top from the stove, and that when they were readying to place it on the floor they were told to drop it, but Pintado did not let go when the other 3 inmates did so. Pintado began holding his hand and screaming. Food service worker Susan Olsen found the amputated finger pieces, and they were placed on ice. (Ex.C).

Pintado stated at deposition, as he alleged in his complaint, that Camargo required him to help with the grill. (Depo, DE#35-1, Ex.A, T/25-26; Complaint, DE#1, p.8, ¶4). In his complaint, Pintado

alleged that he protested to Camargo that he was untrained and lacked skills to fix or perform maintenance on the stove; however, the gravamen of his claim is, and the record demonstrates, that the task that needed to be performed was not one requiring a specialized skill, but simply physical effort to help lift a grill off the top of a stove, so it could be put on the floor for cleaning.

Pintado in his complaint alleged that he, with assistance of another inmate, was attempting to move the stove's grill top which according to him weighed 675 pounds, and that it suddenly fell, resulting in two of his fingers being severed [at the tips]. (DE#1). At deposition, Pintado stated that the grill top weighed between 665 and 765 pounds. (T/26-27). When asked how he knew this, he responded, "Because Mr. Diaz one day told us so." (T/27). Pintado stated that as he was lifting the grill top with help of only one other inmate, he said to Camargo, "this is too heavy," and when the other inmate let go, the grill top "fell back" and his fingers were cut, "on the air," without his [Pintado's] hand ever touching the floor. (T/27-28).

Insofar as Pintado's complaint includes his assertion that he was required to work, it appears that his complaint fails to state a claim.[6] Courts have examined the interplay between inmate labor and the Due Process Clause, the Thirteenth and Eighth Amendments. As held in Hause v. Vaught, 993 F.2d 1079, 1085 (4 Cir. 1993), despite the fact that they are presumed innocent and not and subject to punishment, even pretrial detainees may be required to perform some labor without running afoul of the Due Process Clause or the Thirteen Amendment's ban on involuntary servitude. Hause, supra,

---

[6]     While he asserts he was told by Carmargo to work or receive a Disciplinary Report and be placed in confinement, in this case plaintiff Pintado complied with the order [or request] that he give assistance. The facts here therefore do not give rise to the sort of claim that traditionally might stem from circumstances that plaintiff Pintado faced (i.e., a claim of deprivation of due process arising from issuance of an alleged unwarranted disciplinary report, and resulting confinement). To the extent that he asserts that he was ordered to perform the task that gave rise to his injury, it appears that the assertion is simply part of the larger claim that he was required to work, and that the officer Camargo subjected him to endangerment.

993 F.2d at 1085 (citing <u>Bijeol v. Nelson</u>, 579 F.2d 423, 424 (7 Cir. 1978) ("[d]aily housekeeping responsibilities" are not inherently punitive, and do not violate the Due Process Clause or the 13th Amendment); and citing <u>Martinez v. Turner</u>, 977 F.2d 421, 423 (8 Cir. 1992)). The Eleventh Circuit has held that convicted inmates may be required to work without violating the constitution. <u>Omasta v. Wainwright</u>, 696 F.2d 1304, 1305 (11 Cir. 1983)("hold[ing] that where a prisoner is incarcerated pursuant to a presumptively valid judgment and commitment order issued by a court of competent jurisdiction and is forced to work pursuant to prison regulations or state statutes, the thirteenth amendment's prohibition against involuntary servitude is not implicated").

The separate question of whether particular labor required of an inmate may be violative of the Eighth Amendment is discussed at some length below, with regard to plaintiff Pintado's claim that he was injured after being instructed to help lift and move the heavy grill top. Such a claim turns on whether the work or conditions under which it occurred posed a known risk of harm to the inmate's health or safety; and, if so, whether the defendant knew of the risk of harm to the inmate, and having drawn the conclusion that such a risk existed, he nonetheless ignored it.

Computer assisted research fails to reveal existence of United States Supreme Court, Eleventh Circuit, or Florida Supreme Court case law concerned with claims of Eighth Amendment deliberate indifference in the context of a prisoner claim based on workplace safety. It is noted that in 1994, 2007, and 2010, District Courts from the Southern District of Georgia, the Northern District of Florida, and the Middle District of Alabama faced the same lack of Eleventh Circuit precedent. <u>See</u> <u>Lee v. Sikes</u>, 870 F.Supp. 1096, 1100 (S.D.Ga. 1994); <u>Smalls v. Berrios</u>, No. 3:06cv96/LAC/MD, 2007 WL 1827464 (N.D.Fla., June 25, 2007); <u>Buckley v. Barbour County, Ala.</u>, No. 2:07CV1119-WKW, 2010 WL 1993066 (M.D.Ala., May 17, 2010).

As noted in <u>Smalls</u>, appellate courts from other circuits, when presented with Eighth Amendment workplace safety claims, have held

that prison officials are deliberately indifferent when they "know-ingly compel convicts to perform physical labor which is beyond their strength, or which constitutes a danger to their lives or health, or which is unduly painful." Smalls, supra, at *7 (citing Ray v. Mabry, 556 F.2d 881, 882 (8 Cir. 1977); Morgan v. Morgensen, 465 F.3d 1041, 1045-48 (9 Cir. 2006); Jackson v. Caine, 864 F.2d 1235, 1246 (5 Cir. 1989)). See Cohate v. Lockhart, 7 F.3d 1370, 1374 (8 Cir. 1993).

In this case, for reasons discussed further below, it is apparent from the record that there was not a violation by defendant Camargo of inmate Pintado's Eighth Amendment rights.

In cases where Courts have determined that particular labor required of an inmate violated the Eighth Amendment, the factual scenarios involved were markedly different from those in this case. See e.g., Gill v. Mooney, 824 F.2d 192 (2 Cir. 1989)(officer required inmate to continue working on a defective ladder even though the officer had knowledge the ladder was unsafe); Ambrose v. Young, 474 F.3d 1070, 1078 (8 Cir. 2007)(concluding that defendant was not entitled to qualified immunity, where he required inmate to stomp out a fire burning near a dangling live power line that was a known substantial risk); Sanchez v. Taggart, 144 F.3d 1154, 1156 (8 Cir. 1998)(holding that claim should survive qualified immunity, where inmate was required to assist in sandbagging duty, although the defendant knew that the prior day the same duty had caused the inmate to re-injure his back to the extent that he could not stand and had required medical attention including pain medication); Hall v. Bennett, 379 F.3d 462, 464-65 (7 Cir. 2004)(genuine issues of material fact existed as to whether supervisors knew that inmate could suffer a severe electrical shock as a consequence of working on a live wire without protective gloves).

Alternatively, courts in other cases have failed to find Eighth Amendment violations where the facts suggested that the defendants sued were perhaps negligent, but were not deliberately indifferent. See e.g. Stephens v. Johnson, 83 F.3d 198, 200-201 (8

Cir. 1996) (failure to provide steel-toed boots and other safety equipment was negligence, not deliberate indifference); <u>Brown v. Richmond County Correctional Inst</u>., No. CV105-118, 2006 WL 1431488, at *1-2 (S.D.Ga., May 22, 2006) (concluding that failure to provide plaintiff with safety helmet while cutting tree branches, an activity that itself did not involve an imminent threat of physical harm posing a danger to a prisoner's life or health, did not rise above the level of mere negligence); <u>Franklin v. Kansas Dept. of Corrections</u>, No. 05-3166, 160 Fed.Appx. 730, 736, 2005 WL 3515716, at *4 (10 Cir., Dec. 23, 2005)(holding that even assuming that the risk to the prisoner of a back injury from improperly lifting heavy objects was objectively serious, the allegations at most showed that prison officials may have been negligent, and the failure to ensure that inmates were properly informed of proper lifting techniques was not deliberate indifference).

Here, the inmate plaintiff Pintado's allegations indicate he was assigned a task of assisting another inmate [or inmates] to lift a grill top. He alleges, *inter alia*, that he was not issued gloves. Pintado asserts that he himself knew the grill top was very heavy [having been told so by Mr. Diaz] but, assuming *arguendo* that it was as heavy as Pintado has asserted, Pintado does not allege, nor does the record suggest that Officer Camargo who asked him to lift it knew its weight. According to Pintado, it was only after he started to lift it that he said to Camargo, "this is too heavy." Shortly thereafter, according to Pintado, an inmate who was assisting him lost his grip, they lost control of the grill top, and according to Pintado his fingertips were severed as it began to fall, but without his left hand ever coming into contact with the floor.

Here it is apparent, even when taking Pintado's facts in the light most favorable to him, that any failure by Camargo to appreciate the risk of harm to Pintado amounted, at most to negligence. There is nothing to indicate that Camargo perceived that the labor requested was anything other than heavy lifting. Nothing suggests that Camargo was on notice and drew the conclusion that an inmate's fingertips could be severed by the edge of the grill top, if, as

17

Pintado asserts, the inmate lost his grip and the edge of the grill top cut him. [Nor does the record suggest, under the scenario which Camargo states occurred, that Camargo perceived that Pintado or another inmate would not let go of the top when told to do so, and that Pintado's fingertips would be smashed between the edge of the grill and the floor, severing them]. Thus, this does not appear to be a case in which the defendant knew of but ignored a serious risk of harm to Pintado, thus leading to his injury. It appears to be an incident in which a risk was not perceived, and that perhaps due to negligence, an accident occurred causing what was an unfortunate and serious injury to the inmate worker. In the absence of a constitutional violation, the defendant Camargo is entitled to qualified immunity.

Even if, assuming *arguendo*, it could be said that defendant Camargo's acts or omissions surpassed mere negligence, and sufficed to violate inmate Pintado's Eighth Amendment rights, Camaro would still be afforded qualified immunity, because Pintado's rights were not clearly established at the time of the incident. Mercado v. City of Orlando, 407 F.3d 1152, 1158 (11 Cir. 2005). A plaintiff like Pintado can demonstrate that his rights were clearly established in a number of ways. Mercado v. City of Orlando, 407 F.3d 1152, 1158-59 (11 Cir. 2005). First, he could show that a materially similar case has already been decided, giving notice to corrections staff like defendant Camargo. See Mercado, supra, 407 F.3d at 1159 (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). He could also show that a broader, clearly established principle should control the novel facts in this situation. See Mercado, supra, at 1159 (citing Hope v. Pelzer, 536 U.S. 730, 741 (2002)). Finally, he could show that this case fits within an exception, where it involved conduct which so obviously violates the constitution that prior case law is unnecessary. See Mercado, supra, at 1159 (citing Lee v. Ferraro, 284 F.3d 1188, 1199 (11 Cir. 2002). As noted above in footnote 2 of this Report, to make this showing, and overcome qualified immunity, the plaintiff Pintado must point to law as interpreted by the Supreme Court, the Eleventh Circuit, or the Supreme Court of Florida, indicating that there was such

precedent to put the defendant on notice that his actions would be violative of the inmate's federal rights. See Jenkins, supra, 115 F.3d at 826-27 n. 4; Willingham, supra, 321 F.3d at 1304. Here, the plaintiff has not pointed to, nor does the Court's research reveal, the existence of such precedent.

Accordingly, where defendant Camargo is entitled to qualified immunity, and summary disposition of the complaint against him, the motion for summary judgment (DE#35) should be granted in his favor.

### 2. Balmir and Jarrett (Summary Judgment Motion DE#36) (Claims of Medical Indifference)

### The Law Relating to Medical Claims In the Prison Context

As noted above, §1983 requires an affirmative causal connection between an official's acts/omissions and an alleged constitutional violation. See Harris, Swint, LaMarca, and Williams, supra.

Deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eight Amendment. Estelle v. Gamble, 429 U.S. 97, 104 (1976). Whether an inmate's medical need requires attention as a matter of constitutional right depends upon its severity. See Estelle, supra, at 104-06. Generally, a serious medical need is considered "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Farrow v. West, 320 F.3d 1235, 1243 (11 Cir. 2003) (quoting Hill v. Dekalb Req'l Youth Det. Ctr., 40 F.3d 1176, 1187 (11 Cir. 1994)).

The standard may be met where there is a showing that jail officials denied or delayed an inmate from receiving necessary medical treatment for non-medical reasons, see Ancata v. Prison Health Services, Inc., 769 F.2d 700, 704 (11 Cir. 1985). In addition, officials' inordinate delay in providing necessary treatment, without

medical explanation, may evidence deliberate indifference, <u>Farrow v. West</u>, 320 F.3d 1235, 1247 (11 Cir. 2003), and the standard may be met where there is intentional, unexplained delay in providing to access treatment for serious painful injuries, <u>Brown v. Hughes</u>, 894 F.2d 1533 (11 Cir. 1990), and cases cited therein.

In <u>Estelle</u>, the Supreme Court reasoned that "an inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." <u>Id.</u>, 429 U.S. at 103. Not every claim by a prisoner, asserting that he has not received adequate medical treatment, however, is sufficient to state a violation of the Eighth Amendment. <u>McElligot v. Foley</u>, 182 F.3d 1248, 1254 (11 Cir.1999). Negligence is not enough,[7] and a mere difference of opinion between an inmate and prison medical staff concerning his diagnosis and course of treatment does not rise to the level of a constitutional deprivation.[8] Thus, it is well settled that a showing of mere negligence, neglect, or medical malpractice is insufficient to recover on a §1983 claim. <u>Estelle</u>,

---

[7]    It is well settled that a showing of mere negligence, neglect, or medical malpractice is insufficient to recover on a §1983 claim. A showing of conscious or callous indifference is required. <u>Estelle</u>, <u>supra</u>, 429 U.S. at 104-06; <u>Daniels v. Williams</u>, 474 U.S. 327 (1986); <u>Brown v. Hughes</u>, 894 F.2d 1533, 1537-38 (11 Cir. 1990); <u>Washington v. Dugger</u>, 860 F.2d 1018, 1021 (11 Cir. 1988).

[8]    The Courts have long recognized that a difference of opinion between an inmate and the prison medical staff regarding medical matters, including the diagnosis or treatment which the inmate receives, cannot in itself rise to the level of a cause of action for cruel and unusual punishment, and have consistently held that the propriety of a certain course of medical treatment is not a proper subject for review in a civil rights action. <u>Estelle v. Gamble</u>, <u>supra</u>, at 107 ("matter[s] of medical judgment" do not give rise to a §1983 claim); <u>Harris v. Thigpen</u>, 941 F.2d 1495, 1505 (11 Cir. 1991) ("mere medical malpractice does not constitute deliberate indifference"... "Nor does a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment support a claim of cruel and unusual punishment"). <u>See</u>: <u>Ledoux v. Davies</u>, 961 F.2d 1536 (10 Cir. 1992) (inmate's claim he was denied medication was contradicted by his own statement, and inmate's belief that he needed additional medication other than that prescribed by treating physician was insufficient to establish constitutional violation); <u>Ramos v. Lamm</u>, 639 F.2d 559, 575 (10 Cir. 1980) (difference of opinion between inmate and prison medical staff regarding treatment or diagnosis does not itself state a constitutional violation), <u>cert.</u> <u>denied</u>, 450 U.S. 1041 (1981); <u>Smart v. Villar</u>, 547 F.2d 112, 114 (10 Cir. 1976) (same); <u>Burns v. Head Jailor of LaSalle County Jail</u>, 576 F.Supp. 618, 620 (N.D. Ill., E.D. 1984) (exercise of prison doctor's professional judgment to discontinue prescription for certain drugs not actionable under §1983).

_supra_; _Adams v. Poag_, 61 F.3d 1538 (11 Cir. 1995). In fact, once an inmate has received medical care, courts are hesitant to find that a constitutional violation has occurred. _Hamm v. DeKalb County_, 774 F.2d 1567, (11 Cir.), _cert. denied_, 475 U.S. 1096 (1986).

Treatment violates the Eighth Amendment only if it involves "something more than a medical judgment call, an accident, or an inadvertent failure," _Murrell v. Bennett_, 615 F.2d 306, 310 n.4 (5 Cir. 1980). It must be "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." _Harris v. Thigpen_, _supra_, 941 F.2d at 1505. To show an objectively serious deprivation of medical care, the inmate must demonstrate: 1) an objectively serious medical need that, left unattended, poses a serious risk of harm; 2) that the response made by public officials to that need was poor enough to constitute an "unnecessary and wanton infliction of pain," and not merely accidental inadequacy, negligence in diagnosis or treatment, or even medical malpractice actionable under state law; and 3) an attitude of deliberate indifference, which shows that the defendants were aware of the facts from which a substantial risk of serious harm could be inferred, _and that they actually did draw that inference_. _Taylor v. Adams_, 221 F.3d 1254, 1258 (11 Cir. 2002).

As discussed _supra_, with regard to violation of the Eighth Amendment, the Eleventh Circuit has noted post-_Farmer_, proof that the defendant should have perceived the risk, but did not, is insufficient. _Campbell_ _supra_, at 1364 (citing _Farmer_, at 838); _Cottrell v. Caldwell_, 85 F.3d 1480, 1491 (11 Cir. 1996) (the official must have a subjectively "'sufficiently culpable state of mind,'" and "[t]here is no liability for 'an official's failure to alleviate a significant risk that he should have perceived but did not...'") (quoting _Farmer_, _supra_, 511 U.S. at 834, 838). Liability may be imposed for deliberate indifference only if the plaintiff proves the defendant actually knew of "an excessive risk to inmate health or safety" and disregarded that risk." _Campbell_, _supra_, at 1364 (citing Farmer, at 837).

## Analysis

From the pleading, it appears that the gravamen of Pintado's complaint against Nurse Jarrett is, first, the following. Before he [Pintado] was transported from the kitchen accident site to the prison medical department, Jarrett personally put his severed fingertips into a glass of milk. According to the plaintiff, that placement of the severed tissue in milk is the reason that the fingertips could not be reattached by the surgeon at the hospital.

Pintado further alleges that Nurse Jarrett and Dr. Balmir were indifferent to his serious medical needs because upon his return to prison after surgery at the hospital, he experienced pain, and lacked mobility in his fingers and hand, but they refused to order Cat Scan or MRI tests to diagnose the extent of his nerve damage, and refused to prescribe pain medication or refer him to an outside specialist to confirm, evaluate, diagnose and treat his condition.

Jarrett and Balmir argue, as did the other defendants, that Pintado failed to exhaust his administrative remedies. They also argue that they were not deliberately indifferent to Pintado's serious medical needs, that he was not denied pain medication or other necessary appropriate treatment, that negligence is not a basis for §1983 liability, and that they are entitled to qualified immunity.

With regard to exhaustion, Jarrett and Balmir file (at DE#36-2, Ex.E) copies of the same grievance and grievance appeal documents on which the defendant correctional officers relied. The grievance filed at ECI complained that Pintado was suffering pain, and was being denied medication, and proper assistance with wound care. The appeal to the DOC Central Office in Tallahassee, alleged he was being denied proper pain medication, consultation with a specialist, and physical therapy. The defendants in pertinent part argue that because Pintado did not allege in the grievance and appeal that they were deliberately indifferent to his medical needs, his administrative remedies should be deemed unexhausted. For purposes of this Report, the mere fact that the plaintiff, who

22

is a prisoner, and unschooled in the law, did not use the magic words "deliberate indifference," will not be deemed a basis for finding his administrative remedies to be unexhausted.

That notwithstanding, for reasons discussed below, the defendants' alternative arguments that plaintiff Pintado was not denied medical care, that they were not deliberately indifferent, and that they are entitled to qualified immunity, are dispositive of his complaint. On those grounds they are entitled to summary disposition of the complaint in their favor on all claims raised.

The medical documents of record (DE#36-2, Exs. D and I); the affidavits of defendants Carl Balmir, M.D. (Id., Ex.B) and Jeanette Jarrett, R.N. (Id., Ex.C); the Affidavits of Officer Kimberly Fisher (Id., Ex.F), of Craig Alford (Id., Ex.G), and of Officer Roy Hurtado (Id., Ex.H); and the transcript of plaintiff Pintado's 6/25/2010 deposition (Id., Ex.A) reveal the following evidence, which remains un-rebutted by the plaintiff, who has filed nothing in opposition to the defendants' motion for summary judgment.

The tips of Pintado's left middle and ring fingers were amputated. Nurse Jarrett sent Craig Alford to the kitchen to retrieve them. Jarrett gave Alford two trays, one to collect the tissue, and the second containing ice. Jarrett instructed Alford not to place the tissue directly on the ice but to rather put them on the first tray and put it on the tray containing the ice. A kitchen manager had retrieved the finger pieces. Alford received them from the kitchen staff. He observed the finger pieces, and a no time did he see them placed in or on milk. They were kept indirectly on ice. Jarrett received the severed tissue from Alford, and at no time were they placed in or on milk; rather, they were kept in indirect contact with ice, and were sent to Baptist Hospital in that manner at the same time that inmate Pintado was transported from the prison to the hospital for diagnosis, and surgery. (Exs. C, D, F, G, H). At deposition, Pintado changed his version of the facts regarding the fingertips and milk. When asked what happened to the fingertips, he testified that "they were under the lid" and that

"someone" brought them to the infirmary, and that while at the infirmary he personally saw a nurse/orderly go to the refrigerator to retrieve milk at the request of the nurse, and saw the finger tips being placed in a bag and saw the nurse pour the milk in the bag with the fingertips.

Pintado, in response to defendants' discovery requests, filed medical documents pertaining to his injury and hospital diagnosis, assessment of injury, testing, treatment, and surgery. (Plaintiff's Response to Subpoena, DE#31).

At deposition, Pintado was asked if he was aware that his medical records submitted to the court contained no document stating that his fingertips were in milk, and he responded, "No." (T/31). He was asked if he was aware that the surgeon's report which he submitted to the Court indicated that "the pieces of his fingers were brought but were not replantable due to the level and the mechanism of the injury?", and Pintado responded, "Yes, because the lid fell on them and it weighs like 700 pounds." (T/31-32).[9]

As to the first claim against Nurse Jarrett, it is clear there is no genuine issue as to material fact, and that she is entitled to summary judgment in her favor, where plaintiff's medical rec-ords, as acknowledged by him at deposition, indicate that the fin-gertips could not be reattached, not because of being placed in milk, but due to the nature and extent of the injury. As to this claim, plaintiff Pintado has filed nothing to rebut the defendant's showing [which is based on Pintado's responses in the deposition filed by the defendant in support of her motion].

Based on the Affidavits of Dr. Balmir (Ex.B) and Nurse Jarrett (Ex.C), medical records submitted by the defendants (at Ex.I), and Plaintiff's Deposition (Ex.A), it is apparent that after his re-lease from the hospital plaintiff was provided evaluation and treatment at ECI, including pain medication, and post-surgical mon-

---

[9]    The Surgeon's Report, in question, about which Plaintiff was questioned at p.31-32 of his deposition, appears at DE#31, p.23).

itoring of his dressings pending followup treatment/evaluation at the hospital after surgery. In addition, Pintado was provided materials and instructions for him to begin caring care for his healing wounds when it was appropriate for him to do so; and he was provided an extensive course of physical therapy as well.

Specifically, Dr. Balmir in his affidavit states that he saw Pintado after his return to prison from Baptist Hospital, and provided him appropriate pain medication. Balmir ordered followup consultations which were carried out on August 19 and September 10, 2008, with Dr. Basarre, the surgeon who repaired Pintado's fingers. Balmir also ordered physical therapy, which Pintado attended between October 2 and December 10, 2008, with Rehab 4 You, Inc.

In her Affidavit, Nurse Jarrett, also states that Pintado was seen by her and by Dr. Balmir, for follow up care, which included but was not limited to dressing changes, wound checks, and medication administration. Jarrett also states, as did Dr. Balmir, that Pintado was seen for follow up care and treatment by the outside surgeon, and received physical therapy from October 3 to December 10, 2010, with Rehab 4 You, Inc., inside the prison medical unit.

Both Dr. Balmir and Nurse Jarrett further state in their respective Affidavits that every request for medical care and/or treatment received from Pintado was carefully reviewed, and that appropriate decisions were made, based on the facts and circumstances, in their respective medical judgments and opinions.

Pintado indicated at deposition that after release from the hospital he stayed in the prison infirmary for about 8 or 10 days, and then was released to general population. (T/60-61). He asserted that during that initial period "they never treated my hand" (T/61), and asserted that his bed sheets had gotten stained with blood from his [bandaged] hand. (T/64). In relation to those assertions, Pintado was asked if he was aware that the surgeon's post-operative instructions were that he was to be placed on Vicodin and antibiotics, to limit activity and to not get the

dressing wet and not to change it until the followup appointment with him? (T/63-64). Pintado did not recall that. (T/64).[10] Pintado acknowledged that he was given Tylenol 3, and antibiotics; and at deposition stated his mistaken belief that the Vicodin was an antibiotic. (T/62-63). Pintado acknowledged that upon his first followup visit to the surgeon, the surgeon changed the dressing (T/64, 65), and he further stated that after the third visit to the surgeon his stitches and bandage were removed, and another bandage was put on him to prevent infection. (T/65). He then had to go to the infirmary every day at 9:00 a.m., and after the third trip to the infirmary he was told that he didn't need to be seen there again, and was given all the things he needed to take care of his hand himself at his dorm. (T/65). The supplies provided included "oxygenated water," dressing, tape, and ointment, and an idodine-like solution. (T/65-66). Pintado acknowledged that during the time he was provided supplies for self care, they were replenished every 3-4 days, and he never developed an infection (T/67-68).

Pintado also acknowledged at deposition that he was prescribed and received physical therapy. (T/32). While he recalled having 6 sessions, each consisting of "a maximum three minutes each," (Id.), Pintado's medical records (filed at Ex.I) contain documentation of no less than 26 therapy sessions, of approximately 45 minutes to an hour in duration, between 10/3 and 12/12/08. Pintado also acknowledged at deposition that he was given "home exercises" to do (T/47).

Plaintiff's assertion that the defendant Nurse Jarrett and Doctor Balmir did not order MRI or Cat Scan tests, without any competent evidence to show that it was recommended and necessary, amounts to a difference of opinion between the inmate plaintiff and prison medical staff, which does not suffice to state a claim of a constitutional dimension. Estelle v. Gamble, supra, 429 U.S. at

---

[10]    These instructions, about which Pintado was questioned at deposition, appear in the same Surgeon's Report referenced in connection with the inquiries made to Pintado about why his fingertips could not be re-attached. The postoperative dressing care instructions appear on page 2 of the Report (at DE#31, p.23).

107; <u>Harris v. Thigpen</u>, <u>supra</u>, 941 F.2d at 1505.

In this case, the record presented by the defendant nurse and physician on summary judgment, which is not rebutted by evidence from the inmate plaintiff Pintado, demonstrates that Pintado was not denied medical care. It shows that post-accident he was received at the prison infirmary and transported to the hospital within 30 minutes of his injury, there received surgery, and upon release from the hospital was provided a course of medical care consistent with the surgeon's recommendations, and the defendant medical staff members' considered medical judgment. That course of care included not changing his dressing until his first surgical follow up; providing Pintado with antibiotics and pain medication; ensuring that he was taken for additional post-operative consults with the surgeon, in the mean time monitoring his hand and wound dressing, and when appropriate providing plaintiff instructions and supplies with which to himself care for his healing hand. The course of treatment also included an extensive course of physical therapy from October to December, and instructions on self exercise for his hand.

In sum, it is apparent that the defendants Jarrett and Balmir were not deliberately indifferent to the plaintiff's serious medical needs, as the record does not demonstrate that they deprived plaintiff Pintado of his rights under the Eighth Amendment. It is clear, in the absence of any showing of a constitutional violation which may be attributed to them, that they are entitled to qualified immunity, and that as to them, on all claims, their motion for summary judgment (DE#36) should be granted.

### III   CONCLUSION

For the above stated reasons, it is recommended that: 1) as to the defendants Ms. Sonya and Ms. Dora, the complaint be dismissed pursuant to <u>Fed.R.Civ.P.</u> 4(m); 2) as to his claim of retaliatory transfer, the plaintiff's complaint be dismissed pursuant to 28 U.S.C. §1915(e)(2)(B)(ii); 3) the Motion for Summary Judgment

(DE#35) be granted as to all claims against the defendants Diaz and Camargo [incorrectly referred to in record as Tamargo]; 4) the Motion for Summary Judgment (DE#36) be granted as to all claims against the defendants Jeanette Jarrett, R.N. [incorrectly referred to in the record as Nurse Jerry] and Dr. Carl Balmir, M.D.; and 5) this case be CLOSED.

Objections to this report may be filed with the District Judge within fourteen days of receipt of a copy of the report.

Dated: January 28th, 2011.

_____
UNITED STATES MAGISTRATE JUDGE


cc:  Julio Pintado, Pro Se
     DC# 093810
     Zephyrhills Correctional Institution
     2739 Gall Blvd.
     Zephyrhills, FL 33541-9701


     Kathleen M. Savor, AAG
     Office of the Attorney General
     110 Southeast Sixth St., 10th Floor
     Fort Lauderdale, FL 33301


     Steven M. Lury, Esquire
     QUINTAIROS, PRIETO, WOOD & BOYER, P.A.
     One East Broward, Suite 1400
     Fort Lauderdale, FL 33301